IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

RONALD ALAN HUMMEL,

        Petitioner,

vs.

WARDEN MARTIN FRINK;
ATTORNEY GENERAL OF THE
STATE OF MONTANA,

        Respondents.

Cause No. CV 12-05-BU-SEH-RKS

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE

On January 20, 2012, Petitioner Ronald Alan Hummel filed this action for a
writ of habeas corpus under 28 U.S.C. § 2254. Mr. Hummel is a state prisoner who,
at the time of filing, was proceeding pro se.

On March 27, 2012, Respondent ("the State") was ordered to file an Answer.
It complied on July 2, 2012. Mr. Hummel filed a Reply on July 19, 2012.

On October 18, 2012, the Court ordered that counsel be appointed to represent
Mr. Hummel, and a deadline was set for filing an Amended Petition. Mr. Hummel,
represented by Assistant Federal Defender David Ness, filed his Amended Petition
on March 22, 2013. The State filed its Answer on May 13, 2013.

### I. Background

On May 7, 2006, Mr. Hummel crashed his motorcycle in a Bozeman
intersection. He failed field sobriety tests. Though he refused a breath test, he

requested a blood test and was found to have a blood-alcohol concentration of 0.125. On May 22, 2006, he was charged by Information with a fourth or subsequent offense of driving under the influence of alcohol, a felony; and with driving with a suspended or revoked license and obstructing a peace officer by providing a false name and birth date, both misdemeanors. Aff. at 1-4 ¶¶ 3-12 (doc. 13-2); Information at 1-2 (doc. 13-3). The maximum penalty for the DUI charge was either 13 months in the custody of the Department of Corrections, followed by a five-year suspended term, or, if the offense was a second or subsequent felony DUI offense, 13 months to five years in prison. Mont. Code Ann. §§ 61-8-401(1), -731(1), (3) (2005);[1] Information at 1-2.

On June 8, 2006, the State filed notice of its intent to have Mr. Hummel designated a persistent felony offender. Notice at 1-2 (doc. 13-4). Filing of the notice subjected Mr. Hummel to a mandatory minimum sentence of five years and a maximum sentence of 100 years. Mont. Code Ann. §§ 46-18-501, -502(1).

On August 22, 2006, while on release pending trial, Mr. Hummel was a passenger in another motorcycle accident. He broke one of his hands, and a plate was placed in his knee. He also received a head injury. Because he failed to report to his probation officer, the State petitioned to revoke his pretrial release. On November 16, 2006, at a hearing on the petition to revoke, Mr. Hummel testified at length about the accident and his recovery from it. *See* Hr'g Tr. Nov. 16, 2006, at

---

[1]  Unless otherwise noted, citations to the Montana Code refer to the 2005 edition.

8:6-24:6 (doc. 13-5). The Honorable John C. Brown presided. The State's petition was dismissed and Mr. Hummel was again placed on pretrial release.

Mr. Hummel was represented throughout these proceedings by the Public Defender's Office. On January 10, 2007, Mr. Hummel's attorney, Peter Ohman, advised the trial court – Judge Brown – that competency was not an issue. Omnibus Hr'g Order at 2 ¶ 1 (doc. 13-6). Mr. Ohman also stated he would file, on or before March 12, 2007, a pretrial motion to dismiss based Mr. Hummel's claim that, "[d]ue to mental disease or defect[,]" Mr. Hummel "could not have [the] particular state of mind that is an essential element of the offenses charged," *id.* at 4 ¶ 4(a)-(e). To support the contemplated defense motion, Mr. Ohman obtained a psychological evaluation from Dr. Barton Evans. Because it was obtained at the insistance of the defense, it is not in the state court file or the record before this Court. But Mr. Ohman did not, in fact, file the motion he contemplated. *See* Hr'g Tr. May 23, 2008, at 5:15-16 (doc. 13-28); Answer at 12 ¶ 9 (doc. 13); Trial Court Docket at 3-4 Entries 63-77 (doc. 13-1) (showing no pretrial motion filed until motion to continue filed on May 1, 2007).

On May 1, 2007, Mr. Ohman filed a motion to continue on the grounds that "Mr. Hummel is in the process of procuring a mental evaluation to assist him in his defense." Mot. to Continue at 1 (doc. 13-7). That motion was followed up on May 17, 2007, with a copy of a letter from Dr. James Murphey, who said:

I have had a chance to begin a psychological evaluation on your client, Ron Hummel. Based upon the information I gathered during my clinical interview with Mr. Hummel, I do not think that there is any likely psychological (i.e., emotional) factor which is likely to account for his self-reported memory lapses. Given his history of head injury, however, there is a possibility of a neurological/neuropsychological issue which could account for such a periodic memory disturbance. I am not qualified to perform such an evaluation, so I encourage you to seek an evaluation by a trained neuropsychologist (e.g., Dr. Jeff Cory, who is local).

Dr. Murphey Letter at 1 (doc. 13-8 at 3).

Again, on June 11, 2007, Mr. Ohman represented to Judge Brown that Mr. Hummel's fitness to proceed was not an issue. Second Omnibus Hr'g Order at 2 ¶ 1 (doc. 13-9). Instead of alleging that Mr. Hummel lacked the mental state element, Mr. Ohman stated that, on or before July 13, 2007, he would give notice of his intent to show that Mr. Hummel's "ingestion of alcohol was not a voluntary act based on his mental state at the time." *Id.* at 4 ¶ 4(a)-(e).

On July 3, 2007, Mr. Hummel, acting pro se, asked Judge Brown to remove Mr. Ohman as his counsel. Because neither the Public Defender's Office nor the trial court found the conflict between Mr. Ohman and Mr. Hummel was serious enough to appoint outside counsel, a different public defender, Mary Kramer, appeared in Mr. Ohman's stead on August 7, 2007. Trial Court Docket at 5 Entry 100. Mr. Hummel agreed to this procedure. Hr'g Tr. July 18, 2007, at 8:15-9:1 (doc. 13-11); Hr'g Tr. July 25, 2007, at 1:19-2:14, 3:18-4:6 (doc. 13-12). Judge Brown presided at both of these hearings.

On September 24, 2007, Mr. Hummel, who had been taken into custody at some point, was being monitored on suicide watch at the Gallatin County Detention Center when he removed a lens from his eyeglasses, sharpened it, and cut his own throat.   He received three stitches in his neck.   Mattson Report at 1 (doc. 15-1 at 2). Mr. Hummel told a mental health evaluator that he was frustrated he did not die and intended to try again.   He also had a history of attempting suicide in custody; in 1997, he had attempted to strangle himself.   The evaluator concluded that he was "not competent to give informed consent for medication."   Pet. for Involuntary Commitment at 3 (doc. 13-13).   The State initiated involuntary commitment proceedings.   A hearing was held before Judge Brown.   Mr. Hummel did not contest his commitment and was sent to the State Hospital at Warm Springs for three months.   *Id.* at 2-3;[2] Commitment Hr'g (doc. 13-15).

Over the course of five days in October 2007, Mr. Hummel was evaluated at Montana State Hospital by Dr. Audrey Mattson, a board-certified clinical neuropsychologist.   Dr. Mattson wrote a report – headed "Neuropsychological Consultation Report" – explaining her conclusions based on Mr. Hummel's intelligence testing, academic achievement, neuropsychological functioning, and emotional function.   In the section headed "Summary Impressions," Dr. Mattson

---

[2]   Although the petition stated that "[t]he attorney who most recently represented the respondent is unknown," *id.* at 2, Ms. Kramer represented Mr. Hummel at the hearing.

described Mr. Hummel as having "low average to average intellectual and academic abilities, difficulties with complex attention and timed visual motor skills and significant problems with learning and memory" based on his test results, "if taken at face value." She further noted, however, that his "functional memory abilities seemed fairly good on a day to day basis" and that "[a] number of his comments . . . suggested that he is able to recall, or remember more from his day to day experience than expected based on his test scores." She explained that this discrepancy between testing and day-to-day reality likely arose because "ongoing experience occurs in multiple modalities (i.e., verbal and visual input) and because events with personal significance are often better retained than information with no personal significance (e.g., unrelated or uninteresting test stimuli)." Mattson Report at 7 (doc. 15-1). Although Mr. Hummel had reported "some auditory hallucinations that seem somewhat unusual in nature (i.e., voices are of specific people from his past)," *id.* at 7, he "did not appear to experience auditory hallucinations during the current assessment, and his thought processes seemed well organized and normal in content throughout the examination," *id.* at 8.

Mr. Hummel was discharged on December 12, 2007. His diagnosis included generalized anxiety and social phobia disorders and alcohol dependence as well as "cognitive disorder NOS," presumably meaning "not otherwise specified." Diagnostic Sheet at 1 (doc. 4-1 at 13).

On January 22, 2008, Casey Moore, Mr. Hummel's third public defender, replaced Ms. Kramer. Trial Court Docket at 6 Entry 116. On March 12, 2008, Mr. Moore moved the trial court for a hearing "regarding whether or not [Mr. Hummel] may obtain a neuropsychological evaluation." Mot. for Psych. Eval. at 1 (doc. 13-18). A hearing was required because "Mr. Moore has informed the Defendant that his Office will not pay for or obtain any additional evaluation for the Defendant," but "Defendant feels another evaluation is integral to his defense." *Id.* On March 24, March 25, and April 2, 2008, Mr. Hummel, acting pro se, filed notices in the trial court seeking the evaluation. In the second of these notices, he said:

> I suffer from the mental condition of transient global amnesia due to an accident in 1978 wherein because of a head injury I remained in a coma at the University of Southern [California?] for 14 days and remained at the medical hospital for 4 months in Los Angeles California.
>
> The effects of this mental condition are that I suffer unforeseen spontaneous short-term memory loss which is not observed by those around me. In this instant case I was at a friends house when a "black out" occured and I was later told that my friend's roomate served me a few beers which I had no recollection of whatsoever then or now. I was also taking my medication that day.
>
> Therefore being that my claim of memory loss or disturbance is the core to my defense that I did not act purposely, negligently, nor knowingly; then it is imperative that I receive the neuropsychological evaluation in the interest of truth, right, and justice.

Notice (doc. 13-20) at 1. In the third notice, he explained he was told in 1978 that he had random "blackouts":

> I was told then that the "blackouts" were caused by poor blood flow in my brain and transient global amnesia or P.T.S.D. . . . Through the

years I have sometimes known when I've had a "blackout" but most of the time when they happen I don't know what happens.

I did not know that I was under the influence of alcohol when arrested for D.U.I. I lost my sense of smell in the accident in 1978. I had a major argument with the police officer because he smelled alcohol on me and I thought he was trying to set me up. I was sure the blood test would come back negative. Seventeen days later the blood test came back positive. I knew I had been at Donna Smith's house on May 7, 2006. Because I knew I had gone there. So I asked her about the alcohol. She said while I was there I drank a few beers while talking with her about Candy's death. I don't remember drinking the beers, talking to Donna or leaving Donna's house on my motorcycle. What I do remember is being in the left hand turning space at 4 Corners making a left hand turn onto Main Street going to Bozeman.

Over the years since the accident in 1978, I've learned to live with my "blackouts," "panic disorder," agoraphobia and lack of smell. Though, as I face the D.U.I. charge now, I'm scared of what I've done. Because I really don't have any memory of drinking the beers. And I could have hurt someone with the condition I was in. I was told by Audrey Mattson (lady neuropsychologist at Montana State Hospital) that there was varrious medications I could try for my brain disorders. I really want to pursue those options. I am asking this court for a neuropsychological evaluation to be done on me. The story I just wrote about is the truth. Though, I believe in order for the story to be a defense and believed, that I need to have a validation that a forensic nueropsychological evaluation will offer to my defense.

Notice (doc. 13-21) at 1-2.

On April 4, 2008, Mr. Hummel again attempted suicide at the Gallatin County Detention Center "by falling onto a metal bed frame with the stated desire to cause death." Again, the evaluator concluded that he was "not competent to give informed consent for medication." Again, the State initiated involuntary

commitment proceedings.   Second Pet. for Involuntary Commitment at 2-3 (doc. 13-13).[3]

A hearing was held, again before Judge Brown.   Mr. Hummel appeared by video from Warm Springs.   Again, he did not contest his commitment.   Near the close of the hearing, the prosecutor pointed out that the hearing on Mr. Hummel's motion for a neuropsychological evaluation was set for April 16 and would need to be continued as Mr. Hummel would still be at Warm Springs.   The trial court agreed to continue the hearing to May.   At that point, the following exchange occurred:

| | |
|---|---|
| The Court: | All right.   Very well, then, Mr. Ohman, do you have anything further? |
| Mr. Ohman: | We don't, Your Honor. |
| The Court: | All right.   Very well. |
| Mr. Hummel: | Your Honor. |
| The Court: | Yes, Mr. Hummel. |
| Mr. Hummel: | I was asking you about the – because one of the – the issue with the hearing was going to be about getting a neuropsychological evaluation. |
| The Court: | Yes. |

---

[3]   This petition was filed by the same deputy county attorney who was prosecuting the criminal action.   Although the petition again stated that "[t]he attorney who most recently represented the respondent is unknown," *id.* at 3, Mr. Hummel was represented at the hearing by Mr. Ohman.

| | |
|---|---|
| Mr. Hummel: | And I've been told by Dr. T. Caddell here that I can get that while I'm here. |
| The Court: | All right. But is it – Mr. Hummel, though, does it require a Court order for you to get that? |
| Mr. Hummel: | It might. It might have – I was thinking that it might do so and I was wondering if that could happen? |
| The Court: | All right. |
| Mr. Hummel: | Because what I'm saying it's kind of a good opportunity since I am here to be able to get that evaluation while I am here. |
| The Court: | All right. Mr. Hummel, here's what I suggest. I will ask Mr. Ohman to explain that to Mr. Moore and then I know at this point Mr. Moore – I know previously that the State Public Defender's Office was not – my understanding, was not – willing to pay for a neuropsych exam, but – |
| Mr. Hummel: | Right. |
| The Court: | – if given now that you're going, you're at the Montana State Hospital, I'll have Mr. Ohman talk to Mr. Moore about that. |
| Mr. Hummel: | Okay. |
| The Court: | And Mr. Moore can tell me what he thinks because I'm not sure the function of who pays for what, how that will work, Mr. Hummel. |
| Mr. Hummel: | Okay. |

Second Commitment Hr'g Apr. 7, 2008, at 8:3-9:20 (doc. 13-24). Mr. Hummel was discharged from Montana State Hospital on April 29, 2008. His diagnosis again included alcohol dependence, generalized anxiety and social phobia disorders, and cognitive disorder NOS. Diagnostic Sheet at 1 (doc. 4-1 at 14).

On May 23, 2008, Mr. Hummel appeared for the hearing on his motion for a neuropsychological evaluation. Mr. Moore explained to Judge Brown that the Public Defenders Office would not pay for another evaluation unless Judge Brown ordered it to pay. Hr'g Tr. May 23, 2008, at 1:21-2:13 (doc. 13-28). The State argued that the evaluation was unnecessary because driving under the influence is a strict liability offense in Montana. *Id.* at 8:4-22. It also pointed out that, on the one hand, Mr. Hummel asserted that he "need[s] a neuropsychological evaluation to establish why [he's] going through these blackouts because [he] can't remember anything about what happened, and now he's saying, well, I remember what happened, and I remember that I didn't know that it was alcohol that I was drinking." *Id.* at 12:11-17. Mr. Moore responded that Mr. Hummel wanted to clarify his position. *Id.* at 13:13-19. Judge Brown cautioned Mr. Hummel about his right to remain silent, explaining that "we're on the record and Mr. Kitzmiller can come back at the time of trial and try and use what you say in Court because you're not standing on your right to remain silent, he can use that against you." *Id.* at 14:8-13. Mr. Hummel chose to speak. He said:

. . . I have basically three reasons why the eval is important to my defense. It's not that I'm arguing that I was forced to drink or anything of that nature. What I'm saying is I suffer – well a) in 1970 I was involved in an accident that causes memory loss with me. I don't understand how that brain disorder works. I do know that I did not know that I had consumed alcohol for the crime I'm charged with. In other words, I didn't know – I didn't know that I drank alcohol because it was during a period when I had like a – it was in a period when I had the blackout so I wasn't aware. I didn't purposely, knowingly or negligently try to set myself up for – to drive while I was intoxicated. I didn't try to do that, Your Honor, and being that my claim of memory loss or disturbances of court are my defense, that I did not purposely, knowingly, or negligently, I believe it's imperative that I receive the neuropsychological evaluation in the interests of the truth. . . . [t]here's about three doctors that told me that a forensic, neuropsychological evaluation is detrimental to my defense and they said that, you know, they said that a neuropsychological evaluation will offer a defense for my – for the crime that I committed. . . . [W]ell, I got to watch what I say, but I am confused and I don't – I don't understand because I did not – I did not mentally know. I did not know that I was drinking alcohol. I didn't know.

*Id.* at 14:15-16:4.

On June 24, 2008, Judge Brown denied Mr. Hummel's motion for a second evaluation on the grounds that DUI is an absolute liability offense under Montana law. Order Denying Def.'s Request (doc. 13-29) at 2. Jury trial was set for July 21, 2008. Trial Court Docket at 7 Entry 138.

On July 16, 2008, the parties appeared for a change of plea hearing. Mr. Hummel pled no contest. Although there was no written plea agreement, the State orally undertook to dismiss the two misdemeanor charges if Mr. Hummel pled no-contest to the felony DUI charge. Change of Plea Hr'g (doc. 13-31) at 2:15-24.

Judge Brown asked Mr. Hummel if he understood the persistent felony offender designation was "what we will discuss at sentencing" and "that there is no agreement going into sentencing in this matter." Asked whether he understood that, Mr. Hummel twice said, "Yes, Your Honor, I do." *Id.* at 4:17-5:7. Judge Brown also said:

> The Court: And I know, Mr. Hummel, I have to ask you this question just because I know you and I understand that there are sometimes issues in your life, but are you under any disability or impairment that would prevent you from understanding these proceedings today?
>
> Mr. Hummel: Not at this time, Your Honor.

*Id.* at 5:21-6:4.

On July 27, 2008, Mr. Hummel wrote a letter to Judge Brown "to ask that I can have formal treatment for my alcohol addiction. . . . [i]nstead of being warehoused." Letter at 1 (doc. 13-32). Mr. Hummel told the probation officer who prepared the presentence report that he "would like to go to the WATCh program," the Warm Springs Addiction Treatment & Change Program, "[a]nd follow it up with parole and the Re-Entry program offered through Harry Faber and the teem mentoring program." Presentence Report (doc. 13-33) at 5 (quoting Mr. Hummel's letter).

The Presentence Report listed ten previous convictions for driving under the influence; fifteen other driving-related offenses, including an open container violation; an assault and five batteries, including one against a police officer; eight thefts or criminal trespasses; two drug offenses; one first-degree and one felony burglary; and convictions for resisting arrest, criminal contempt, escape, disorderly conduct, and sexual intercourse without consent, for a total of 48 previous convictions, plus three violations of probation or parole. Presentence Report (doc. 13-33) at 2-4. Mr. Hummel was on supervision for his previous DUI conviction when he committed the DUI offense in this case. He also reported that he "has suffered from flashbacks and blackouts due to his drug use" and "his drinking alcohol has caused issues such as blackouts." *Id.* at 5. The presentence report further noted that "Mr. Hummel has violated jail rules such as refusing orders, possession of tobacco products and destroying his medications," accumulating thirteen violations in pretrial detention. *Id.* at 4.

On August 25, 2008, Mr. Hummel, acting pro se, filed a motion to withdraw his guilty plea. He stated:

> 1) . . . [E]ven though mental state is not an element of my alleged offense the law never requires impossibilities and due to my long standing reoccurance of 'blackouts' whereupon I have no knowledge of what transpired as in this instance as I did not know nor did I recollect having drank an intoxicating substance, prior to riding my motorcycle, which caused my condition which I claim was not a contributing factor

14

in my having to lay my motorcycle down to avoid a collision with a white S.U.V. making a right turn on a red light onto Main Street.

2) I refer to maxims of law "beyond man's control" and "act of God." Mercy triumphs over judgment.

3) I am also claiming my right of second opinion. When I spoke with Audrey Mattson at Montana State Hospital, she told me with the number of head injuries I have had, there is no wonder why I have 'blackouts.' I bring to the courts attention: Page one of the order denying defendant's request for neuropsychological evaluation. "The Public Defenders Office has already paid for one neuropsychological evaluation." When the Public Defenders did pay for an evaluation, it was not a neuropsychological evaluation. The prior evaluation does not cover the issues of my defense. The doctor not being qualified for this type of evaluation.

Notice of Withdrawal of No Contest Plea (doc. 13-35) at 1-3 [sic].

Judge Brown found that Mr. Hummel's pro se submission did not meet the good-cause standard for withdrawing a plea before sentencing, *see* Mont. Code Ann. § 46-16-105(2), but it gave Mr. Moore an opportunity to file a motion on Mr. Hummel's behalf. Hr'g Tr. Aug. 25, 2008, at 7:1-13. Mr. Moore filed his motion and brief on August 29, 2008, explaining that Mr. Hummel "feels he was forced to change his plea because the Court denied his request for a neuropsychological evaluation," and he "did not at that time have funds to pay for an evaluation." Since then, however, Mr. Hummel's sister had apparently offered to pay for the evaluation. Mot. to Withdraw Plea at 5 (doc. 13-37). The State filed a response, which is not in the record before the Court. Mr. Hummel, acting pro se, replied to it on October 3, 2008. He said:

"Transient global amnesia," first described in 1964, consists of an abrupt loss of memory lasting from a few seconds to a few hours, without loss of consciousness or other evidence of impairment. The individual is virtually unable to store new experience, suffering permanent loss of memory for that period of the attack. There is also a retrograde loss that may initially extend up to years preceding the attack. This deficit shrinks but leaves an enduring gap in memory that seldom exceeds the hour before onset. Because, the person (I) is left with a persisting memory gap only for what happened during the attack itself and in a short period immediately preceding. . . . Defect of memory may be transitory, as after an alcoholic bout, or it may be enduring as after a severe head injury. . . .

. . . [A]n intoxicated condition is not a defense to any offense . . . "unless" the defendant proves that he did not know that it was an intoxicating substance when he . . . injested the substance causing the condition. I did not know it was an intoxicating substance when I drank it. I have no memory of drinking alcohol when I did. I'm asking for the opportunity to prove my defense.

Def.'s Resp. at 1-2, 3-4 (doc. 13-38). Again, on October 7, 2008, Mr. Hummel, acting pro se, added that "Audrey Mattson . . . applied a brief evaluation of the memory disfunction. With a recommendation of further exploration of the illness." Def.'s Supp. Mot. at 2 (doc. 13-39).

On October 9, 2008, Judge Brown denied Mr. Hummel's motion to withdraw his no-contest plea. It noted that "[t]here is no issue concerning Mr. Hummel's mental competency at the time he changed his plea." Order Denying Mot. to Withdraw Plea at 3 (doc. 13-41). Judge Brown found Mr. Hummel knew, when he entered his no-contest plea, that he had not received the evaluation he sought. Lack of that evaluation, the court reasoned, could not retrospectively render involuntary a

plea that was voluntary when it was entered.  Judge Brown also reiterated that "[w]hether Mr. Hummel suffered from an episode of amnesia and remembers drinking alcohol . . . is irrelevant."  *Id.* at 4.

On October 10, 2008, Mr. Hummel appeared for sentencing.  Various corrections were made to the Presentence Report, which are reflected in the copy in this Court's record.  Sentencing Tr. at 4:22-13:9 (doc. 13-42).  Mr. Hummel spoke at length on his own behalf.  In part, he said:

> . . . I get this thing in me that I just don't care no more and I do stupid things.  I chose to buy the Harley Davidson, I didn't have a driver's license.  I chose to drive it anyways.  I didn't start drinking right away until I started, would be driving on the Harley, I'd be like in Livingston or wherever and I'd say, well, I'll just go into this bar or whatever.  I wouldn't drink a whole lot.  I was trying not to, you know, but being an alcoholic it's you know, once you – once I choose to take just one drink, there's just no stopping.

*Id.* at 25:5-17.

Mr. Hummel was sentenced to serve 25 years in prison.  *Id.* at 33:19-24.  No portion of the sentence was suspended, but he will be eligible for parole after serving six years and three months.  Mont. Code Ann. § 46-23-201(3).

Mr. Hummel appealed.  He argued that Judge Brown erred in denying his motion to withdraw his no-contest plea and that trial counsel was ineffective because he failed to move to dismiss the charges based on a speedy trial violation.  The

Montana Supreme Court affirmed his conviction. *State v. Hummel*, No. DA 08-0612, slip op. at 3 ¶¶ 6-8 (Mont. Aug. 25, 2009) (unpublished order).

On May 21, 2010, Mr. Hummel petitioned the trial court for postconviction relief, asserting that the court should have *sua sponte* ordered a competency determination and that trial counsel "told Mr. Hummel word for word what the Judge would ask, and how to answer back" at the change of plea hearing. Mr. Hummel also claimed he had stopped taking certain medications, which had been causing him dizziness and confusion, two weeks before the change of plea hearing, and so was experiencing "fear and unreasonable thinking" at the time he pled guilty. Postconviction Pet. at 6, 8 (doc. 13-48). Judge Brown denied relief, and the Montana Supreme Court affirmed his ruling. *Hummel v. State*, No. DA 10-0439, slip op. at 3-4 ¶ 8 (Mont. June 1, 2011) (unpublished order).

Mr. Hummel filed his federal petition on January 20, 2012.

## II. Mr. Hummel's Claims

Mr. Hummel alleges, first, that his constitutional right to the effective assistance of counsel was violated because trial counsel:

A. provided misleading and inaccurate advice during the change of plea proceedings;

B. failed to inform Mr. Hummel of the maximum penalty he faced;

C. falsely promised Mr. Hummel would receive leniency if he pled no contest;

18

D.     failed to investigate and present evidence that Mr. Hummel was not competent to plead no contest; and

E.     failed to provide the trial court with relevant and available evidence to support Mr. Hummel's motion to withdraw his no-contest plea.

Am. Pet. (doc. 24) at 20-21.

Mr. Hummel also alleges that the trial court violated his constitutional right to due process by:

A.     failing to inquire *sua sponte* into his competence to enter a no-contest plea; and

B.     failing to advise him of the maximum penalty he faced.

*Id.* at 21.

## III. Analysis

The Amended Petition does not allege additional facts beyond those already alleged in the original Petition.

Before trial, a defendant is presumed innocent.   After he is convicted at trial, the burden shifts.   The petitioner has not only the burden of proving his claims, but also the burden of alleging facts sufficient to support an inference, if true, that his constitutional rights were violated.   Consequently, a § 2254 petition must "state the facts supporting each ground" for relief.   Rule 2(c)(2), Rules Governing Section 2254 Proceedings for the United States District Courts.   A § 2254 petition must "set out substantive facts that will enable the court to see a real possibility of

constitutional error." *Aubut*, 431 F.2d at 689. Section 2254 is not a device to be used by prisoners "who seek to explore their case in search of its existence." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1106 (9th Cir. 1996) (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1979)).

## A. Claim 1

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Hummel must allege facts sufficient to support an inference (1) that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### 1. Misleading and Inaccurate Advice as to Plea

Mr. Hummel contends that his mental and emotional state at the time of the crime was relevant to his guilt. He is mistaken.

The statute under which Mr. Hummel was convicted makes it "unlawful . . . for a person who is under the influence of [] alcohol to drive or be in actual physical control of a vehicle upon the ways of this state open to the public." Mont. Code Ann. §§ 61-8-401(1). Subsection (7) of the statute provides that "[a]bsolute

liability as provided in 45-2-104 will be imposed for a violation of this section."

Mont. Code Ann. § 45-2-104 provides:

> A person may be guilty of an offense without having, as to each element of the offense, one of the mental states of knowingly, negligently, or purposely only if . . . the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described.

Liability for DUI is absolute. *State v. Ellenburg*, 938 P.2d 1376, 1377-78 (Mont. 1997).

Mr. Hummel's claim that he did not know he was drinking an intoxicating substance,[4] *see* Am. Pet. at 7 ¶ 11 para. 2, draws on a specific provision of Montana law.

> A person who is in an intoxicated condition is criminally responsible for his conduct, and an intoxicated condition is not a defense to any offense and may not be taken into consideration in determining the existence of a mental state that is an element of the offense unless the defendant proves that *he did not know that it was an intoxicating substance* when he consumed, smoked, sniffed, injected, or otherwise ingested the substance causing the condition.

Mont. Code Ann. § 45-2-203 (emphasis added.)

But this statute does not help Mr. Hummel. It addresses the mental-state element of an offense. Under the DUI statute, there is no mental-state element.

---

[4]  The claim is dubious anyway. If Mr. Hummel blacked out, then he could not know whether he did or did not know what he was doing while he was drinking and then driving under the influence. The burden of proof at trial would be his. The alleged state of global transient amnesia prevented Mr. Hummel, not from committing an offense, but from proving a defense.

Even if Mr. Hummel proved he did not know he was drinking something intoxicating, he had no defense to the charge. Counsel did not err in telling him so. Claim 1A should be denied.

### 2. Maximum Penalty

Mr. Hummel's Amended Petition does not allege that, had he been correctly advised of the maximum possible penalty, he would have chosen not to plead no-contest and would instead have gone to trial. *Hill v. Lockhart*, 474 U.S. 52, 59-60 (1985). Claim 1B should be denied.

### 3. Promise of Leniency

In his original Petition, Mr. Hummel contended that counsel "induced my plea of guilty with misleading statements," Pet. at 5 ¶ 15B, that is, by saying "a guilty plea would be favorable to me because of the jail time I had already done." Br. (doc. 4) at 4. In his original Reply, Mr. Hummel claimed – for the first time, *see, e.g.*, Postconviction Pet. (doc. 13-48) at 1-9, Br. in Supp. of Postconviction Pet. at 1-15 (doc. 13-49), Br. in Supp. of Pet. (doc. 4) at 1-15 – that counsel told him the persistent felony offender designation would be dismissed if he pled guilty, Reply (doc. 15) at 2, 4.

A "gross mischaracterization of the likely outcome" at sentencing, "combined with . . . erroneous advice on the possible effects of going to trial," may support a finding that a guilty plea was involuntary. *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir.

1986).   But Mr. Hummel was correctly advised about his chances at trial.   He had no defense.   Moreover, Mr. Hummel does not say what sentence counsel told him he would likely receive.   His allegation is consistent with an inference that counsel told him a guilty plea would probably lead to a lesser sentence than conviction at trial.   That is probably not incompetent advice from any attorney in any case.

Given Mr. Hummel's lack of any defense, and particularly in light of his astounding criminal history, a guilty plea was indeed the only evident means of reducing the likely sentence.   Counsel did not err in saying so.   Claim 1C should be denied.

### 4. Investigation and Presentation of Evidence as to Competency

To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and . . . a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam).   In collateral proceedings, the petitioner has the burden of proving he is entitled to relief, including the burden of proving that he was not competent at the time of trial.   *See McKinney v. United States*, 487 F.2d 948, 949 (9th Cir. 1973).

Mr. Hummel's Amended Petition alleges no facts beyond those shown in the state court's record and set out at length in Part I.   His original Petition stated that he presented substantial evidence of brain injury, "two suicide attempts, commitments

to state hospital, medication use, irrational behaviors and past mental health disorders." Pet. (doc. 1) at 4 ¶ 15A. These allegations are true, and they warranted exploration of his competence. But he had two evaluations, one by a psychologist and one by a neuropsychologist. Mr. Hummel has not alleged any facts sufficient to support an inference that yet another evaluation would have shown he was not competent to proceed, and the record does not support such an inference on its own. On the contrary, Mr. Hummel repeatedly gave appropriate responses to questions and frequently volunteered, both in open court and in written submissions, information about a mental state that was hard to explain and understand but was, nevertheless, clearly communicated.

Based on all the facts and allegations before the Court, reasonable counsel could well have found Mr. Hummel competent to assist in his defense and to make an intelligent choice between pleading guilty and going to trial. Claim 1D should be denied.

### 5. Evidentiary Support for Motion to Withdraw Plea

As stated, Mr. Hummel alleges no facts beyond those shown in the state court's record. Claim 1E should be denied.

## B. Claim 2

### 1. *Sua Sponte* Inquiry into Competence

"A competency determination is necessary only when a court has reason to doubt the defendant's competence." *Godinez v. Moran*, 509 U.S. 389, 402 n.13 (1998). The record of the case gives no indication that Mr. Hummel was not competent to enter a plea. Judge Brown interacted with Mr. Hummel on numerous occasions – far more than most judges in most cases – including two involuntary commitment proceedings at which Mr. Hummel gave rational responses to questions and even made his own rational suggestions without prompting from counsel. The record does not remotely suggest that Judge Brown should have observed anything unusual or questionable about Mr. Hummel's understanding of what was happening or his ability to assist counsel. Claim 2A should be denied.

### 2. Advice of Maximum Penalty

Again, Mr. Hummel's Amended Petition does not allege that, had he been correctly advised of the maximum possible penalty, he would have chosen not to plead no-contest and would instead have gone to trial. *Hill v. Lockhart*, 474 U.S. 52, 59-60 (1985). Claim 2B should be denied.

## C. Conclusion

All of Mr. Hummel's claims should be denied.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Counsel was appointed to assist Mr. Hummel in preparing his Amended Petition. The Amended Petition alleges no facts beyond those alleged in the original Petition. The facts alleged in the original Petition are not sufficient to support further proceedings or relief on the merits. Mr. Hummel has not made any showing of any substance that he was deprived of a constitutional right. A COA should be denied.

Based on the foregoing, the Court enters the following:

**RECOMMENDATION**

1.  The Amended Petition (doc. 24) and the original Petition (doc. 1) should be DENIED for lack of merit.

2.  The Clerk of Court should be directed to enter, by separate document, a judgment in favor of Respondents and against Petitioner.

3.  A certificate of appealability should be DENIED.

DATED this 21st day of October, 2013.


_____/s/   Keith Strong_____
Keith Strong
United States Magistrate Judge